ASSOCIATION FOR WOMEN IN SCIENCE, Appellant,

v.

Joseph A. CALIFANO, Jr., Secretary of United States Department of Health, Education and Welfare, et al.

No. 75–2139.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1976.

Decided Oct. 21, 1977.

---

**29.** *See* Reply Brief for Appellant at 13 n.15.

■■■■■■■■■■■■■■■■■■■■■■■

Gladys Kessler, Washington, D. C., for appellant.

Judith S. Feigin, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before DANAHER, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

Association for Women in Science (AWIS) appeals under 28 U.S.C. § 1292(b) from an order of the district court (Green, J.) denying its motion to compel compliance with a notice for inspection and copying of executed conflict of interest forms on file with the Department of Health, Education and Welfare (HEW). The principal issue on appeal is whether these forms are privileged, and therefore not subject to dis-

covery under the Federal Rules of Civil Procedure. For the reasons outlined below, we hold that the forms are privileged, and thus we affirm.

I

Under the Public Health Service Act[1] and appropriate departmental regulations,[2] HEW and the National Institutes of Health (NIH) administer a program which provides grants to educational or training institutions desiring to work on matters relating to the diagnosis, prevention, and treatment of diseases with public health significance.[3] Grants can be awarded only if recommended by the national advisory council in each Institute of Health.[4] These councils, and their various committees, are composed of distinguished members of the medical and scientific communities whose function is to exercise "peer review" over pending grant applications.[5]

In March 1974, AWIS[6] brought suit against the Secretary of HEW and various directors of NIH in the United States District Court for the District of Columbia, seeking declaratory and injunctive relief to remedy alleged illegal awarding and funding of training grants. As pertinent here, AWIS alleged that the grants were awarded in a manner violative of the applicable conflict of interest standards set forth in Executive Order No. 11222, 3 C.F.R. 306 (1964–1965 Compilation). In particular, AWIS charged that individuals whose own applications were pending, or who were affiliated with institutions with applications pending, were allowed to sit on the training committees which initially reviewed com-

---

1. 42 U.S.C. §§ 216, 241(d), 289c (1970 & Supp. V 1975).

2. 42 C.F.R. §§ 64.1–.8 (1976).

3. The training grant program apparently was terminated, at least in large part, by the National Research Act, Pub.L. No. 93–348, § 104, 88 Stat. 347 (1974). The Act, however, expressly exempted from termination those commitments made prior to its enactment, *id.* § 104(b), and continued funding thus is available for those grants awarded prior to July 12, 1974.

4. 42 C.F.R. § 64.3 (1976); *see* 42 U.S.C. § 289j (1970). For an excellent description of the grant application review process, see *Grassetti v. Weinberger,* 408 F.Supp. 142, 147–49 (N.D. Cal.1976).

5. *See* 42 U.S.C. § 289*l*-4 (Supp. V 1975).

6. AWIS describes itself as "a non-profit organization with over 1500 members organized to promote equal opportunities for women to enter the scientific professions and to achieve their career goals." Brief for Appellant at 2.

peting applications. The Government denied any impropriety in the conduct of the program.

The discovery process established. that HEW Form 474, entitled "Confidential Statement of Employment and Financial Interests," the conflict of interest form required of special government employees, had the most complete listing of the professional, institutional, and corporate affiliations of those individuals sitting on the training committees. A notice for inspection and copying of the Forms 474, pursuant to rule 34 of the Federal Rules of Civil Procedure, was filed by AWIS.[7] The Government objected on the grounds that the forms were explicitly labeled "confidential," were protected from disclosure by regulation, and, as personnel files, were within exemption 6 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(6) (1970).[8] When AWIS filed a motion to compel compliance with the notice for inspection and copying,[9] the Government again objected. In addition to its previous grounds for nondisclosure, the Government maintained that the Forms 474 were not subject to discovery because they were not relevant to any issue before the court, were within exemption 4 of the FOIA as "commercial or financial information obtained from a person and privileged or confidential," and were protected by the Privacy Act of 1974, 5 U.S.C. § 552a (Supp. V 1975).[10]

Judge Green subsequently issued an order denying the motion by AWIS to compel compliance. She stated that

it appear[s] to the Court that the disclosure of these documents would impair the government's ability to acquire this information in the future, and that the information was given with the expectation it

would remain confidential, *National Park[s] and Conservation Association v. Morton,* [162 U.S.App.D.C. 223], 498 F.2d 765 (D.C. Cir.1974), see 5 U.S.C. § 552(b)(4) and that the disclosure of these documents would constitute a clearly unwarranted invasion of privacy, see 5 U.S.C. § 552(b)(6) . . ..[11]

AWIS then filed a motion for reconsideration of the order, or for certification pursuant to 28 U.S.C. § 1292(b) (1970).[12] Judge Green denied the motion for reconsideration, but granted the motion for certification.[13] This appeal ensued.

II

■ At the outset, it must be emphasized that AWIS sought the Forms 474 through the discovery process and *not* through an FOIA request. As we shall discuss below, any matter which is relevant to the subject matter involved in the pending action can be discovered, unless it is privileged. The Government's assertion of exemptions 4 and 6 of the FOIA as defenses to production, therefore, must be read as a claim of privilege, and as such is clearly inapposite. The FOIA neither expands nor contracts existing privileges, nor does it create any new privileges. *Chamber of Commerce of the United States v. Legal Aid Society of Alameda County,* 423 U.S. 1309, 1310–11, 96 S.Ct. 5, 46 L.Ed.2d 14 (Douglas, Circuit Justice, 1975); *Verrazzano Trading Corp. v. United States,* 349 F.Supp. 1401, 1403 (Cust. Ct.1972). *But see Renegotiation Board v. Bannercraft Clothing Co.,* 415 U.S. 1, 30, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974) (Douglas, J., dissenting). As intimated in its brief,[14] and explicitly stated at oral argument, the Government wisely has abandoned the

7. Record, vol. II, at 52.

8. *Id.* at 53. The Government also maintained that *curriculum vitae* of the training committee members had been furnished to AWIS, and that this action constituted sufficient disclosure.

9. *Id.* at 59.

10. *Id.* at 63.

11. Joint Appendix (J.A.) at 146.

12. *Id.* at 147.

13. *Id.* at 148.

14. Brief for Appellee at 7.

FOIA argument on appeal.[15] Our analysis, therefore, will proceed based upon traditional discovery theory.

As mentioned above, a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." Fed.R.Civ.P. 26(b)(1). While the various discovery rules "are to be accorded a broad and liberal treatment . . . limitations come into existence when the inquiry touches upon the irrelevant or encroaches upon the recognized domains of privilege." *Hickman v. Taylor,* 329 U.S. 495, 507–08, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947).

The relevancy of the Forms 474, only lightly challenged by the Government below,[16] is hardly open to dispute, especially under the liberal standard to be applied at the discovery stage.[17] The existence of conflicts of interest at the time training grants were awarded is the linchpin of the appellant's argument, and it is difficult to imagine anything more probative of this issue than the Forms 474. The sole question to be answered, therefore, is whether the forms were privileged.

■ In addition to those privileges which are available to all litigants, the United States has a number of privileges which are unique to it. Chief among these is executive privilege, the claim of which has constitutional underpinnings. *United States v. Nixon,* 418 U.S. 683, 703–06, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The Supreme Court has recognized this privilege for documents that contain military or diplomatic secrets, *United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), or the deliberations of high executive officials, *United States v. Nixon.* Lower court decisions have also recognized executive privilege for intra-governmental documents re-

flecting policy deliberations. *Machin v. Zuckert,* 114 U.S.App.D.C. 335, 316 F.2d 336, *cert. denied,* 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963); *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena,* 40 F.R.D. 318 (D.D.C.1966), *aff'd mem. sub nom. V. E. B. Carl Zeiss, Jena v. Clark,* 128 U.S.App.D.C. 10, 384 F.2d 979, *cert. denied,* 389 U.S. 952, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967).

There are three other privileges which have been claimed exclusively by the government. These privileges are based primarily on specific governmental interests, rather than on constitutional principles. The first is the informer's privilege, recognized in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), which protects from disclosure the identity of persons who furnish information to law enforcement officials. The governmental interest in this instance is the protection of the flow of information concerning possible violations of the law. The second privilege is the law enforcement evidentiary privilege, *Black v. United States,* 184 U.S.App. D.C. 46, at 56–62, 564 F.2d 531, at 541– 547, No. 75–2039 (1977), which is based primarily on the harm to law enforcement efforts which might arise from public disclosure of government investigatory files. The third privilege, with which we are concerned in this appeal, has been called both the required reports privilege,[18] and the official information privilege.[19] This privilege, *Black v. United States,* 184 U.S.App. D.C. 46, at 56–62, 564 F.2d 531, at 541– 547, No. 75–2039 (1977), which is based it has received from citizens. It is directly analogous to the informer's privilege, for it is based on the governmental interest in protecting the flow of information concerning the subject of the report in question. Because the terms "required reports" and "official information" are somewhat broad

---

**15.** The Government also does not urge its Privacy Act argument in this appeal, since the Act was not in effect when suit was filed. *See id.* at 16–17 n.17.

**16.** Record, vol. II, at 63.

**17.** *See* C. Wright & A. Miller, Federal Practice and Procedure § 2008, at 41 (1970).

**18.** *See* Note, *The Required Reports Privilege,* 56 Nw.L.Rev. 283 (1961).

**19.** *See* Note, *Discovery of Government Documents & the Official Information Privilege,* 76 Colum.L.Rev. 142, 149–52 (1976).

in their import,[20] however, we prefer to use a more precise expression—the confidential report privilege—in our analysis.

■ For the confidential report privilege even to be considered, the confidentiality requirement must be statutorily based. It will not suffice that the government merely has held the report out as confidential, by marking the report form "confidential," for example.[21] See Ackerly v. Ley, 137 U.S. App.D.C. 133, 136–7, 420 F.2d 1336, 1339–40 n.3 (1969). Similarly, the privilege will not be called into play simply because a department head, acting only on general authority, declares via regulation that reports submitted to his agency are to be considered "confidential." Cf. 5 U.S.C. § 301 (1970) ("housekeeping" statute does not authorize withholding of information or records).

■ The specific legal authority for confidentiality in this case is Executive Order No. 11222, supra (the same document upon which AWIS bases part of its claim), which prescribes standards of ethical conduct for government officers and employees. This executive order has as a significant part of its statutory basis 5 U.S.C. § 631 (1964), which was concerned primarily with standards of conduct for Civil Service Commission (CSC) employees. See Exec. Order No. 11222, § 601, 3 C.F.R. 306, 310.[22] One year after the executive order was issued, a new title 5 of the U.S. Code was enacted,[23] and section 631 was rescinded and replaced in part by a new section 7301. This section states simply: "The President may prescribe regulations for the conduct of employees in the executive branch." Thus, the

action by the President in this instance has a distinct statutory foundation; indeed, it is to be accorded the force and effect of a statute. Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 & n.1 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); see Old Dominion Branch No. 496, National Association of Letter Carriers, AFL–CIO v. Austin, 418 U.S. 264, 273 n.5, 94 S.Ct. 2770, 2776 n.5, 41 L.Ed.2d 745 (1974) (an executive order such as this "is plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch").

Similarly, the regulations issued by the CSC and HEW are based on the executive order and on the President's statutory authority to delegate appropriate functions to his subordinates. 3 U.S.C. § 301 (1970). The key point to be made here is that the agency regulations derive not from the general "housekeeping" statute, 5 U.S.C. § 301 (1970), which was formerly a "reliable roadblock to discovery,"[24] but from an executive order with the force of law. With these considerations firmly in mind, we proceed to an examination of the language of the executive order and regulations.

Part III of the executive order prescribes standards of ethical conduct for special government employees and requires that each special employee submit a conflict of interest statement.[25] This statement must list all other employment of the employee, as well as "such other financial information as the appointing department or agency shall decide is relevant in the light of the

**20.** Use of the term "official information" derives largely from its mention in the proposed rule 509 of the Federal Rules of Evidence. 56 F.R.D. 183, 251 (1973). As used in that rule, however, official information included intragovernmental opinions or recommendations and investigatory files, as well as the type of confidential reports under scrutiny here.

**21.** Once the confidentiality requirement is found to be statutorily based, however, the representations made by the government are significant, because the public should be able to expect its government to honor obligations made to induce full and accurate information. See Nat'l Parks & Conservation Ass'n v. Mor-

ton, 162 U.S.App.D.C. 223, 226, 498 F.2d 765, 768 (1974).

**22.** Also used as statutory authority were 18 U.S.C. §§ 205, 208(b) (1970). See Exec. Order No. 11222, § 502, 3 C.F.R. 306, 310 (1964–1965 Compilation). See generally 18 U.S.C. § 201 note (1970).

**23.** Act of Sept. 6, 1966, Pub.L. No. 89–554, 80 Stat. 524 (codified at 5 U.S.C. (1970 & Supp. V 1975)).

**24.** See 76 Colum.L.Rev., supra note 19, at 148.

**25.** Exec. Order No. 11222, supra note 22, § 306.

duties the appointee is to perform." [26] Part IV of the executive order, which requires reporting of financial interests, does not apply explicitly to special government employees, but it does empower the CSC to "prescribe regulations, not inconsistent with this part, to require the submission of statements of financial interests *by such employees, subordinate to the heads of agencies, as the Commission may designate.*" [27] Further, in unequivocal language, this same part directs that:

> The statements and amended statements required by or pursuant to this part shall be held in confidence, and *no information as to the contents thereof shall be disclosed except as the Chairman of the Civil Service Commission or the head of the agency concerned may determine for good cause shown.*[28]

Pursuant to the executive order, the CSC issued regulations requiring employment and financial statements from *all* government employees, including special government employees.[29] These regulations direct that "[a]n agency shall hold each statement of employment and financial interests, and each supplementary statement, in confidence. . . . An agency may not disclose information from a statement except as the Commission or the agency head may determine for good cause shown." [30]

■ Under the authority of the executive order and CSC regulations, HEW issued regulations requiring employment and financial statements of its regular [31] and special [32] government employees. The regulations state specifically that, in the case of special government employees, "[a] *confidential* file of completed statements of employment and financial interests shall be maintained . . .." [33] Review of the executive order and appropriate regulations, therefore, convinces us that the Forms 474 are reports whose confidentiality is required by proper legal authority.[34]

However, we do express concern about the length to which one must go to reach this conclusion with regard to these forms. For the confidential report privilege to be invoked, the requirement of confidentiality must be readily apparent from the applicable statutes and regulations. In this case, while there are many references to confidentiality, the language used for regular government employees is far more explicit than that used for special government employees. We believe this shortcoming springs from the inconsistent and awkward construction of Executive Order 11222, and we suggest that now might be an appropriate time to consider publishing a new executive order on standards of ethical conduct, with its authority squarely based on 5 U.S.C. § 7301 (1970). In view of the events in recent years, and the current Administration's correct emphasis on avoiding even the appearance of impropriety by government employees, there is little doubt that some improvement can be made in the

26. *Id.*

27. *Id.* § 402 (emphasis added).

28. *Id.* § 405 (emphasis added).

29. *See* 5 C.F.R. §§ 735.401–.412 (1977). Subsection 735.412(a) directs that "[a]gency regulations issued under this subpart for special Government employees, as a minimum, shall contain provisions covering the reporting requirements set forth in this section [for all other employees]."

30. *Id.* § 735.410.

31. 45 C.F.R. §§ 73.735–1001 to .735–1005 (1976).

32. *Id.* §§ 73.735–1201 to .735–1209.

33. *Id.* § 73.735–1203(e) (emphasis added).

34. It is interesting to note that not only the consultants and the Government relied upon the confidentiality of the Forms 474. At an earlier stage in the proceedings, when AWIS was seeking the *curriculum vitae* it later received, counsel for AWIS stated:

> There is a document which we would concede is confidential and haven't asked for, namely, after people are appointed, they do have to submit on—I think it is HEW form 474—conflict of interest dates, but that is confidential under HEW regs. and whether they are right or not, we certainly can get all we need from the curriculum vitae information which was submitted.

Transcript of Proceedings, July 10, 1974, at 36.

twelve-year-old document upon which current regulations are based.[35]

Determining that these forms are confidential reports is but a first, albeit important, step. The legal authorities which create the confidential report privilege divide into three categories. The first type expressly privileges documents from disclosure in judicial proceedings,[36] and may result in a complete bar to discovery.[37] The second type specifically provides that confidential reports must be furnished to a requesting court.[38] The third, and largest category is composed of authorities such as those in issue here, which bar disclosure without specifying from whom they are to be withheld.[39]

In our view, authorities of this third type create a qualified privilege, analogous to that recognized in *Roviaro v. United States,* 353 U.S. at 62, 77 S.Ct. 623.[40] Thus, in determining whether to compel disclosure, a court must balance "the need of litigants for information possessed by the Government and the need of the Government to foster the flow of information provided to it." *Westinghouse Electric Corp. v. City of Burlington,* 122 U.S.App.D.C. 65, 72, 351 F.2d 762, 769 (1965); *see McKillop v. Regents of the University of California,* 386 F.Supp. 1270, 1274–78 (N.D.Cal.1975). We are also mindful of the admonition of this court in *Freeman v. Seligson,* 132 U.S.App. D.C. 56, 78, 405 F.2d 1326, 1348 (1968), that "[t]he principle favoring full access . . . to relevant information, in the absence of strong competing considerations, is an important foundation for the achievement of justice . . . [and] clear and strong indication is required before it may be implied that the policy of prohibition is of such force as to dominate the broad objective of doing justice."

■ We agree with Judge Green that this high standard has been met in this instance, and that the balance tilts in favor of the governmental interest. We recognize the need of AWIS for the type of information contained in the Forms 474, but as we shall discuss below, there may be other, less intrusive means of securing that information. Even if there is not that opportunity, however, we believe that the Government's requirement for accurate conflict of interest information from those entrusted with recommending the allocation of public funds is the more compelling need. Disclosure of the Forms 474, as Judge Green noted, very likely would impair the Government's ability to acquire this information in the future, for "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests . . ." *United States v. Nixon,* 418 U.S. at 705, 94 S.Ct. at 3106. In the absence of a promise of confidentiality upon which they can rely, significant numbers of individuals might not apply for governmental positions, or perhaps worse, might apply, but fail to disclose information which could give evidence of a potential conflict of interest. At a time when public confidence in the institutions of government has been sharply eroded, it is imperative that the Executive—indeed *all* branches of government—be permitted to utilize every possible means to prevent further erosion. Information concerning potential conflicts of interest is in every measure as important as the information on potential violations of the law recognized in *Roviaro.* The hardship to indi-

---

**35.** *See generally* H.R. 1, 95th Cong., 1st Sess. (1977); S. 555, 95th Cong., 1st Sess. (1977).

**36.** *See, e.g.,* 45 U.S.C. § 41 (1970) (railroad accident investigations); 49 U.S.C. § 1441(e) (1970) (Federal Aviation Act records). *See also St. Regis Paper Co. v. United States,* 368 U.S. 208, 218, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961).

**37.** *See* C. Wright & A. Miller, Federal Practice and Procedure § 2019, at 160 (1970). *But see* 76 Colum.L.Rev., *supra* note 19, at 150.

**38.** *See, e.g.,* 8 U.S.C. § 1202(f) (1970) (State Department visa records); 38 U.S.C. § 3301 (1970) (Veterans' Administration records).

**39.** *See, e.g.,* 42 U.S.C. § 1306(a) (1970).

**40.** *See* McCormick on Evidence § 112, at 238–39 (E. Cleary ed. 1972).

vidual litigants which results from the assertion of privilege in these instances is, in our view, outweighed by "an interest legislatively or judicially deemed more important to society as a whole." *Freeman v. Seligson,* 132 U.S.App.D.C. at 78, 405 F.2d at 1348 n.124 (Robinson, J., dissenting).

■ Even though disclosure of the Forms 474 cannot be compelled, AWIS still may be able to acquire the information it desires. It appears that the confidential report privilege, like the informer's privilege, is shared by the reporter and the government. *See Westinghouse Electric Corp. v. City of Burlington,* 122 U.S.App.D.C. at 71, 351 F.2d at 768; *cf. Roviaro v. United States,* 353 U.S. at 59, 77 S.Ct. at 627 ("informer's privilege is in reality the Government's privilege"). In this case, the Government has agreed to waive its "share" of the privilege,[41] and thus AWIS can obtain the Forms 474 from any consultant willing to release his or her form. *See Brockway v. Department of the Air Force,* 518 F.2d 1184, 1186 (8th Cir. 1975); *Rabbitt v. Department of the Air Force,* 401 F.Supp. 1206, 1209 (S.D.N.Y. 1974).

In response to a questionnaire sent by AWIS, sixty-two out of seventy-six consultants—over eighty percent—indicated that they would not object to making public their professional affiliations and financial holdings.[42] Since AWIS intends to use the information obtained in statistical extract form—*e.g.,* X percent of Y training committee was composed of persons affiliated with Z institution—it appears that sufficient data can be accumulated to produce a reliable sample. It is also noteworthy that AWIS has pledged to use the information obtained only for purposes of this lawsuit and in the most limited manner possible.[43] If this fact is conveyed to the individual consultants, the waiver rate may be even higher, since the first questionnaire was

rather broadly phrased.[44] Because there may be a natural suspicion on the part of consultants who are queried by AWIS, however, we direct that the trial judge require HEW and NIH to request waiver by the individual consultants, indicating: 1) that the Government has no objection whatsoever to the release of this information, and, in fact, encourages it;[45] 2) that the Forms 474 have already been screened and show no evidence of conflict of interest;[46] 3) that release of information will in no way jeopardize one's position as a consultant; and 4) that the data will be used only in this proceeding and in the most limited manner possible. In this way, AWIS may obtain most, if not all, the information it seeks, without adversely affecting the governmental interest detailed above.

■ One last issue, which was not raised below or on appeal, is whether the confidential report privilege was properly claimed in this instance. To assert executive privilege, for both state or military secrets and intra-governmental communications, the head of the agency involved must lodge a formal claim of privilege, after actual personal consideration of the documents in question. *United States v. Reynolds,* 345 U.S. at 7–8, 73 S.Ct. 528; *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena,* 40 F.R.D. at 326 & n. 33. The same strict requirements must be met to claim the law enforcement evidentiary privilege. *Black v. United States,* 184 U.S. App.D.C. 46, at 58–59, 564 F.2d 531, at 543–544, No. 75–2039 (1977).

In the instant case, the confidential report privilege was claimed not by the Secretary of HEW, but rather by the U.S. Attorney for the District of Columbia.[47] Nevertheless, we believe the privilege was properly asserted. Unlike state or military secrets, intra-governmental communications, and most law enforcement evidentiary files,

---

**41.** Brief for Appellee at 16–17.

**42.** Brief for Appellant at 22.

**43.** *Id.* at 8–9.

**44.** *Id.* at 22 n.11.

**45.** Brief for Appellee at 14–17.

**46.** *See* 45 C.F.R. § 73.735–1203(d) (1976); Brief for Appellee at 5.

**47.** Record, vol. II, at 53.

348

the confidential reports filed here are all in a standard format,[48] and little, if anything, could be gained by having the Secretary of HEW review each Form 474 before claiming the privilege. The situation here is much more analogous to *Roviaro v. United States,* where an objection by the Government, when asked to supply the name of the informer, apparently was sufficient to claim the informer's privilege. 353 U.S. at 55, 77 S.Ct. 623.

This result is not inconsistent with *Reynolds,* because a key factor in that decision was that the privilege in question, like the privileges for intra-governmental communications and law enforcement evidentiary files, "belongs to the government and must be asserted by it; it can neither be claimed nor waived by a private party." 345 U.S. at 7, 73 S.Ct. at 532 (footnotes omitted). As we discussed above, however, the confidential report privilege and the informer's privilege are shared by the reporter and the government, and can be waived by the concurrence of the two holders of the privilege. For this reason, and because review by the Secretary of HEW would be of little or no benefit, we believe the claim of privilege was properly asserted by the Government's objection to the notice for inspection and copying.[49]

III

For the foregoing reasons, we hold that the Forms 474 sought by AWIS are privileged, and hence we affirm Judge Green's denial of the motion to compel compliance with the notice for inspection and copying of the forms. We direct, however, that the Government make a concerted effort, as outlined above, to secure waivers from the individual consultants. In this manner, we intend that AWIS be able to receive a substantial portion of the information it

48. It may be that, in future cases, some confidential reports are not in a substantially standard format, and indeed may be more similar to the law enforcement evidentiary files discussed in *Black.* In those cases, personal review by the agency head may be required.

49. *See* Rule 509(e), *Proposed Federal Rules of Evidence,* 56 F.R.D. 183, 251–52 (1972); 76

seeks,[50] without adversely affecting the Government's ability to obtain this information in the future.

*Affirmed.*

Colum.L.Rev., *supra* note 19, at 166–67; 56 Nw.L.Rev., *supra* note 18, at 300–01.

50. Counsel for AWIS may also wish to supplement information received from the Forms 474 with information that could be obtained through the use of carefully constructed interrogatories, as we suggested at oral argument.